UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>MARCEL BOYD,<br><br>Defendant. | 5:24-CR-50140-CCT<br><br>**ORDER ADOPTING REPORT AND RECOMMENDATION AND DENYING DEFENDANT'S MOTION TO SUPPRESS** |

Defendant Marcel Boyd is indicted with the charge of possession of a firearm by a prohibited person in violation of 18 U.S.C. §§ 922(g)(3) and 924(a)(8). Docket 1. He moves to suppress from evidence a Taurus handgun that law enforcement found on July 10, 2024, in the bedroom where he was apprehended. *See* Docket 21. The Court referred Boyd's motion to Magistrate Judge Daneta Wollman under 28 U.S.C. § 636(b)(1)(B). After holding an evidentiary hearing, Docket 28, Magistrate Judge Wollman recommended that Boyd's motion to suppress be denied, Docket 39 at 32. Boyd filed timely objections to the Report and Recommendation, Docket 41, and the government did not file a response. After reviewing the record and Report and Recommendation de novo, this Court adopts the Report and Recommendation factual findings and adopts the magistrate judge's legal conclusions upholding the officers' search under the consent and exigent circumstance exceptions to the Fourth Amendment's warrant requirement.

1

## LEGAL STANDARD

This Court's review of a magistrate judge's report and recommendation is governed by 28 U.S.C. § 636 and Federal Rule of Criminal Procedure 59. Because motions to suppress evidence are considered dispositive matters, the Court reviews de novo objections to the magistrate judge's recommendations. 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b); *United States v. Raddatz*, 447 U.S. 667, 673–74 (1980). Under this review, the Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge" and "may also receive further evidence or recommit the matter to the magistrate judge with instructions." 28 U.S.C. § 636(b)(1); Fed. R. Cim. P. 59; *United States v. Craft*, 30 F.3d 1044, 1045 (8th Cir. 1994).

## BACKGROUND

On July 10, 2024, Lieutenant Isaiah Crow and Officer Tristian Terkildsen of the Oglala Sioux Tribe Department of Public Safety were at a gas station in Kyle, South Dakota, at approximately 1:00 a.m. when they heard a gunshot come from a nearby housing area. Docket 33 at 5–6. Shortly thereafter, they received a radio dispatch that shots had been fired from the same locale. *Id.* at 5. Both Lt. Crow and Officer Terkildsen responded to the housing area. *Id.* at 6.

Once in the housing area, an eyewitness provided Officer Terkildsen a clothing description of a person who entered House 136 with a firearm, pointed the weapon at the individual's brother, and then left. *Id.* at 7, 37–38. Before Officer Terkildsen could make his way over to House 136, dispatch informed him that the same individual was now at House 342, waving and discharging

the firearm, so Officer Terkildsen drove to this house. *Id.* at 38. At the same time, Lt. Crow was driving with his searchlight illuminated in the area where shots reportedly came from a suspect by the name of Marcel Boyd, according to dispatch. *Id.* at 6–7. On the north side of House 322, Lt. Crow saw a man standing outside run into the residence as soon as he saw Lt. Crow's patrol automobile. *Id.* at 7. This person's clothes matched the clothing description an eyewitness provided to Officer Terkildsen at House 136, and House 322 is across the street from House 342. *Id.*

Officer Terkildsen arrived at House 322 and contacted Lt. Crow; they set up a perimeter around the house. *Id.* at 8. They attempted to contact Boyd in the house by knocking and announcing themselves as police, but there was no response. *Id.* at 8, 39. While waiting for backup to arrive, Lt. Crow saw a female child wave at him from one of the house's windows; he described the juvenile's waving motion to indicate a request that he enter the house. *Id.* at 8. While waiting for backup to arrive, Officer Terkildsen overheard a loud argument, including a male's voice, coming from a different corner of the house, but he could not understand what was said. *Id.* at 40. Eventually, Officer Julian Montgomery arrived on scene as backup. *Id.* at 8.

Lt. Crow briefed Officer Montgomery on all that had occurred up to that point and then explained that they were going to force entry into the home due to the exigent circumstances of the situation. *Id.* at 9, 41. The three officers approached the door, and Lt. Crow again yelled, "Police"; after receiving no response, he kicked in the door. Exhibit 1 at 0:12–0:20. After clearing the

3

kitchen, the officers began clearing the living room and attached bedrooms where they encountered Boyd, a woman, and a three-year-old female child lying on a bed in the bedroom where Officer Terkildsen had heard the argument come from. *Id.* at 0:40. The woman was Heather Bettelyoun, and the child was her and Boyd's daughter. Docket 33 at 42, 80, 82.

The officers directed Boyd, Bettelyoun, and their daughter to show their hands and keep them up. Exhibit 1 at 0:42–1:30. As this was done, Officer Montgomery removed a samurai sword from the bed near Boyd's feet. *Id.* at 1:19. Next, the officers directed Bettelyoun and the juvenile to leave the bedroom. *Id.* at 1:25. Shortly thereafter, Officer Montgomery placed Boyd in handcuffs and walked him out of the house. *Id.* at 2:09–3:28. After Boyd was taken outside, Lt. Crow began speaking to Bettelyoun in the living room, near the doorway to another bedroom in the back of the house. Docket 33 at 10–11, 43, 93. Lt. Crow testified that Bettelyoun told him that she did not know what was going on or what had happened. *Id.* at 11. She said that Boyd had been outside but reentered the house upset and holding a firearm. *Id.* She reported that Boyd previously abused her and essentially forced her to be with him, so she tried to stay quiet lest "she would have gotten beaten up." *Id.* She said Boyd grabbed the samurai sword and swung it around while telling her to be quiet and get on the bed. *Id.* She continued that when she saw the police emergency lights on outside, she told her eleven-year-old daughter to get the officers for help. *Id.* at 11–12, 82–83.

4

Lt. Crow then asked Bettelyoun about the firearm, and she responded that she owns a firearm, and it is usually kept in a safe in the closet of the bedroom where the officers found her, Boyd, and their daughter. *Id.* at 12. Lt. Crow asked if they could search the bedroom for the firearm to which she gave permission. *Id.* Officer Terkildsen cleared the bedroom and its closet after Officer Montgomery removed Boyd. *Id.* at 43. While walking out of the house to return his duty rifle to his patrol vehicle, Officer Terkildsen overheard Bettelyoun give Lt. Crow permission to look for the firearm in the bedroom. *Id.* As Officer Terkildsen secured his rifle, Officer Montgomery placed Boyd in the back of his patrol vehicle. *Id.*; Exhibit 1 at 4:14. After Officer Terkildsen reentered the house, Exhibit 1 at 4:39, he began searching for the firearm in the bedroom. Docket 33 at 44.[1]

After speaking to Bettelyoun and while Officers Montgomery and Terkildsen were outside, Lt. Crow spoke with Bettelyoun's eleven-year-old daughter who had waved out the window at him earlier. *Id.* at 12–13. She was crying but explained that Boyd came into the house with a handgun in his hand. *Id.* at 13. This frightened her because Boyd appeared as though he might charge toward her or use the gun on her or Bettelyoun. *Id.* She also stated Bettelyoun asked her to get help. *Id.*

---

[1] On direct examination, Lt. Crow stated he reported to Officer Terkildsen Bettelyoun's permission to search the bedroom. Docket 33 at 12. Officer Terkildsen also testified that Lt. Crow told him of her consent to search the bedroom. *Id.* at 43, 53. However, on cross-examination, Lt. Crow stated that he only told Officer Montgomery of her consent. *Id.* at 26. Despite this discrepancy, the issue can still be resolved on the facts before this Court.

About fifteen seconds after Officer Terkildsen reentered the house, Officer Montgomery also reentered. Exhibit 1 at 4:53. Lt. Crow emerged from the back bedroom area as Officer Montgomery walked through the living room, and Lt. Crow told him that Bettelyoun said she has a gun but does not know where it is and that Boyd could have used it. *Id.* at 5:07–5:12. The officers discovered the handgun underneath the mattress where Boyd had been lying about fifty seconds after Officer Montgomery reentered the bedroom and began searching. *Id.* at 5:15–6:04.

## DISCUSSION

The magistrate judge recounted this factual background and reviewed Boyd's claims, the evidence in the record, and the governing law in her Report and Recommendation. *See generally* Docket 39. Boyd filed objections to both the Report and Recommendation's findings of fact as well as its legal conclusions. *See generally* Docket 41.

### I.   Boyd's Factual Objections

"When a defendant objects to the factual findings of a magistrate judge, the district [court] must make its own *de novo* determination of the facts with no deference to the magistrate judge's findings." *United States v. Running*, 698 F. Supp. 2d 1186, 1189 (D.S.D. 2009). In doing so, "the district judge must make an independent review of the record, including tapes of evidence and the transcript of evidentiary hearings before the magistrate judge." *Id.* Boyd makes three objections to the magistrate's findings of fact. All are addressed below.

> i. **Heather Bettelyoun gave consent to search her bedroom**

Boyd first contests the magistrate judge's finding of fact that Heather Bettelyoun gave consent to the officers to search her bedroom. Docket 41 at 2–3. He supports this objection with four findings he believes the magistrate court omitted. *Id.* These are: (1) Lt. Crow only asked if Officers Montgomery and Terkildsen are ready before forcing entry into Bettelyoun's residence and thus did not brief Officer Montgomery when he arrived on scene; (2) Officer Terkildsen was already with Lt. Crow and observed and participated in forcing entry; (3) Lt. Crow yelled, "Police," one time before kicking in the door to the residence; and (4) Lt. Crow never knocked. *Id.*

The Court reviewed the suppression hearing transcript, Docket 33, and Officer Montgomery's body camera footage, Exhibit 1. The Court does not see how these four claims are determinative or support this objection that Bettelyoun consented to the bedroom search. Even accepting Boyd's argument that the Report and Recommendation omits the facts he references, those facts are not necessary to the Court's resolution of Boyd's legal objection to the determination that Bettelyoun consented to the bedroom search, which is analyzed below. This objection is overruled.

> ii. **Officer Terkildsen overheard Lt. Crow speaking with Bettelyoun when she gave consent to search for the gun in the bedroom**

In the same vein as his first objection, Boyd next objects to the finding that Officer Terkildsen could overhear Bettelyoun give Lt. Crow consent to search the bedroom. Docket 41 at 3. Boyd asserts that Officer Montgomery's body camera footage contradicts Officer Terkildsen's testimony that he

7

overheard Bettelyoun's consent. *Id.* He claims the footage shows Officer Terkildsen was with Officer Montgomery until they exited the house. *Id.*

In reviewing the footage, it is not clear where Officer Terkildsen was standing as Officer Montgomery exited the residence or whether where Officer Terkildsen was standing made it impossible for him to overhear Lt. Crow's conversation with Bettelyoun when she gave consent. Boyd has not carried his burden showing the magistrate judge's findings were incorrect.

Boyd continues that the Report and Recommendation "wholly ignores the timeline of events that refute [Lt.] Crow's claims that [Officer] Terkildsen overheard the permission and that [Lt.] Crow relayed the consent to [Officer] Terkildsen and [Officer] Montgomery . . . ." Docket 41 at 4. However, the Report and Recommendation well details and outlines how the events transpired. The footage and suppression hearing transcript evidence does not indicate that the Report and Recommendation "wholly ignores the timeline of events." *See* Docket 39 at 6–9 ("Officer Terkildsen told the court that he heard Heather Bettelyoun tell Lieutenant Crow there was a firearm in the house and that the officers had permission to look for it in the bedroom."). Therefore, this objection is overruled.

### iii.  Bettelyoun gave wholly inconsistent, not credible testimony that was not given weight

Boyd objects to the magistrate's findings of fact that Bettelyoun gave "wholly inconsistent" and "not credible testimony" and that her testimony was given no weight. Docket 41 at 5. He notes that Bettelyoun testified consistent with the officers' testimony regarding her eleven-year-old daughter waving out

8

the window and her asking her daughter to wave out the window. *Id.*; *see* Docket 33 at 82–83. He also notes that Bettelyoun testified her children went to bed around 9:30 p.m. or 10:00 p.m. and that the eleven-year-old was up and walking around the house at 3:00 a.m. Docket 41 at 5; *see* Docket 33 at 81, 82.

The Report and Recommendation does not describe Bettelyoun's testimony as "wholly inconsistent" or that it gives no weight to any of her testimony. Docket 39 at 11–17. Rather, the Report and Recommendation identifies inconsistencies in Bettelyoun's testimony which supported finding her "recent testimony that she did not give consent to not be credible and gives it no weight," not that it gives no weight to any of her testimony. *Id.* at 16–17; *see id.* at 11.

As examples, the magistrate judge found inconsistent that Bettelyoun first testified she was not awake until police forced entry into the house, Docket 33 at 80, but then shortly thereafter testified Marcel awoke her, which was before police entered the house, *id.* at 81. Docket 39 at 14. Also, the magistrate judge considered Bettelyoun's testimony that her eleven-year-old daughter went to bed at 9:30 p.m. or 10:00 p.m. to be inconsistent with Bettelyoun testifying that she was up later that night. Even if this testimony is not inconsistent because this daughter could have gotten up after going to bed, this finding is immaterial to the overall credibility determination. As the Report and Recommendation does not find Bettelyoun's testimony wholly inconsistent, this objection is overruled.

9

## II. Boyd's Legal Objections

### i. Whether Bettelyoun gave consent to search the bedroom

Boyd argues that Lt. Crow's and Officer Terkildsen's testimonies should not be relied upon because they are discredited by Officer Montgomery's body camera footage regarding Bettelyoun's consent to search. Docket 41 at 5–6. He contends Officer Terkildsen started searching before Lt. Crow told him about Bettelyoun's consent, and the magistrate judge unreasonably relied upon their testimonies despite numerous false statements they made while testifying. *Id.*

The government must prove by a preponderance of the evidence that "consent to the search was given freely and without coercion." *See United States v. Becker*, 333 F.3d 858, 861 (8th Cir. 2003); *Florida v. Royer*, 460 U.S. 491, 497 (1983) ("the State has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given, a burden that is not satisfied by showing a mere submission to a claim of lawful authority."). The question of consent is a question of fact. *United States v. Jones*, 254 F.3d 692, 695 (8th Cir. 2001).

Here, Lt. Crow testified that Bettelyoun gave permission to search the bedroom after he asked if they could search for the gun she owned. Docket 33 at 12. Officer Terkildsen corroborated this in his testimony, stating he overheard Bettelyoun give permission to look for the gun in the bedroom as he left the house to put his rifle back in his patrol car. *Id.* at 43, 46–47. While there are discrepancies between the body camera footage and the officers' testimonies, the record provides sufficient factual evidence to warrant a finding

10

that Bettelyoun provided consent to Lt. Crow to search the bedroom after Officer Montgomery took Boyd to the patrol car.

The suppression hearing transcript and Officer Montgomery's body camera footage corroborate the officers' testimonies. The footage shows Lt. Crow standing in the living room, where he said he spoke with Bettelyoun about the gun, as Boyd is removed from the house. Exhibit 1 at 3:08–3:13; Docket 33 at 93 (Bettelyoun's testimony about speaking to Lt. Crow in the living room). The footage also shows Officer Montgomery leaving the house with Boyd. Exhibit 1 at 3:17–3:33.

Bettelyoun testified that the officers did not ask whether they could search for the gun but instead told her they knew one was in the house and they would not leave until they found it. Docket 33 at 85. But this is in direct conflict with Lt. Crow's and Officer Terkildsen's testimonies. Moreover, for various reasons, the magistrate judge deemed Bettelyoun's testimony about her consent biased and unreliable and discredited her testimony to that extent. Docket 39 at 14–15.

Additionally, Detective Chad Sayles with the Rapid City Police Department testified to communications that Boyd and Bettelyoun had with one another while Boyd was in custody after this arrest that indicate Bettelyoun's bias and favorability toward Boyd. *Id.* at 62. These communications between Boyd and Bettelyoun included discussions about the pending federal charges in this case and seemed to discuss how Bettelyoun should respond to law enforcement about this incident and the gun in question

11

that was allegedly possessed by Boyd. *Id.* at 66–70. Further, in discussing Bettelyoun's own testimony, the magistrate judge noted that during the suppression hearing, she perceived Bettelyoun to testify with a bias and motive to inaccurately describe the sequence of events when Boyd was arrested. Docket 39 at 14.

While inconsistencies exist between Officer Montgomery's body camera footage and Lt. Crow's and Officer Terkildsen's testimonies, they do not discredit their whole testimonies. The officers did not include that Bettelyoun granted consent to search the bedroom in their initial reports, and this Court concurs with the magistrate judge that it is concerning that mention of Bettelyoun's consent is absent from both Lt. Crow's and Officer Terkildsen's initial reports. *See* Docket 39 at 22. However, Officer Terkildsen testified that his practice is to note in the report the grounds upon which the search was conducted and the absence of such information in the original report was unusual. Docket 33 at 58. The magistrate judge found his testimony in this regard to be credible. Docket 39 at 22.

"Because the magistrate judge was in a better position to evaluate any conflicting testimony, the court gives deference to the magistrate judge's conclusion regarding the credibility of the officers versus [Bettelyoun]." *United States v. Mitchell*, No. 4:21-CR-40008-01-KES, 2021 WL 3769809, at *3 (D.S.D. Aug. 25, 2021). This Court defers to the credibility findings of the magistrate judge and finds the officers' testimonies credible and, on the issue of consent, Bettelyoun's testimony not credible.

12

Boyd continues by assuming, as he factually objected above, that it was impossible for Lt. Crow to tell Officer Terkildsen of Bettelyoun's consent before the latter began searching the bedroom. Docket 41 at 6. However, regardless of whether Lt. Crow told Officer Terkildsen they had consent to search or not, Officer Terkildsen's testimony is that he heard Bettelyoun grant consent herself. Therefore, it is not determinative here whether Lt. Crow expressly told Officers Montgomery and Terkildsen of Bettelyoun's consent to search the bedroom.

Further, the fact that Bettelyoun granted Lt. Crow consent to search alone is enough to warrant the search permissible under the Fourth Amendment, as Lt. Crow and the other two officers responded to the scene, and they were all working the scene when voluntary consent was granted. "The validity of a search 'may be based on the collective knowledge of all of the law enforcement officers involved in an investigation if some degree of communication exists between them.'" *Williams*, 521 F.3d at 907 (quoting *United States v. Gonzales*, 220 F.3d 922, 925 (8th Cir. 2000)) (holding one officer's knowledge of consent to search a hotel room may be imputed to other officers because they responded to and investigated the call as a team).

Boyd suggests that there are "numerous other testimonial falsities" that discredit the officers' testimonies, making them unreliable. Docket 41 at 6. He asserts the unreasonableness of the magistrate judge relying on the "numerous false statements [Lt. Crow] and [Officer] Terkildsen made from the witness stand." *Id.* But it is noted that the arguments raised by Boyd in objecting to the

13

Report and Recommendation are arguments he made to the magistrate judge regarding suppression before the Report and Recommendation was issued and were addressed by the magistrate judge in her decision. *See* Docket 37 at 2–6; Docket 39 at 21–22, 30.

This Court conducted a de novo review of the record, and it reviewed the scrutiny undertaken in the Report and Recommendation and agrees with its reasoning. As such, the Report and Recommendation is adopted regarding its legal analysis of Bettelyoun's consent and Boyd's objection is overruled.

    **ii.**    **Whether exigent circumstances existed to search the bedroom**

Boyd contends that the magistrate judge relies upon "demonstrably false statement[s] of facts" in finding that exigent circumstances existed to permit a warrantless search of the bedroom. Docket 41 at 6. He recites his factual disagreements with the Report and Recommendation, namely that immediately prior to forcing entry, Lt. Crow knocked on the door twice and advised he would kick the door in if they did not answer. *Id.*; *see* Docket 39 at 28. He continues that the residence was secure after Boyd was placed in the patrol vehicle and that no one aside from the officers was in the bedroom where the gun was suspected to be. Docket 41 at 6. Under these facts, Boyd believes no exigency existed.

All searches must be reasonable. U.S. Const. amend. XIV. If conducting a search without a warrant, an exception to the Fourth Amendment's warrant requirement must exist for the search to be reasonable. *See United States v. Khabeer*, 410 F.3d 477, 482–83 (8th Cir. 2005) ("The Fourth Amendment

14

generally prohibits police from entering a home without a warrant unless the circumstances fit an established exception to the warrant requirement."). "[E]ven though a warrant must generally be secured, a non-consensual, warrantless search can be justified by reasonable exceptions, including exigent circumstances." *United States v. Ramirez*, 676 F.3d 755, 759 (8th Cir. 2012) (first citing *Kentucky v. King*, 563 U.S. 452, 459 (2011); and then citing *Williams*, 521 F.3d at 908). The relevant exception to the warrant requirement here is that of exigent circumstances.

"Officers are allowed to conduct a warrantless search when faced with certain urgent circumstances." *United States v. Janis*, 387 F.3d 682, 687 (8th Cir. 2004) (citation modified). The "legitimate concern for the safety of individuals may constitute exigent circumstances justifying warrantless entries and searches." *Id.* (citation modified). Exigent circumstances include situations where law enforcement officers render emergency assistance to someone in a home in need of aid or to prevent the imminent destruction of evidence. *Missouri v. McNeely*, 569 U.S. 141, 149 (2013); 3A Wright & Welling's Federal Practice & Procedure § 678 (4th ed. 2010) ("The Fourth Amendment does not require police officers to stop and obtain a warrant when reacting to an emergency which threatens lives."). "The analysis of whether [the exigent circumstances] exception to the warrant requirement has been made out is an objective one 'focusing on what a reasonable, experienced police officer would believe.'" *United States v. Amburn*, 412 F.3d 909, 915 (8th Cir. 2005) (citation modified).

15

The parties only contest whether exigent circumstances existed surrounding the bedroom search for the gun that Boyd was suspected of using outside. Neither argue whether probable cause existed. *See* Docket 34 at 16 (noting "the officers then had probable cause to arrest Boyd" (quoting Docket 22 at 5)). Thus, Boyd's reiteration of his factual objections regarding what Lt. Crow did and said before forcing entry into the house need not be addressed.

This Court observes that the D.C. Circuit Court of Appeals found exigent circumstances existed under similar circumstances. *United States v. Hendrix*, 595 F.2d 883, 886 (D.C. Cir. 1979), *abrogated on other grounds by, Georgia v. Randolph*, 547 U.S. 103 (2006). There, the government claimed exigent circumstances existed that created a life-threatening danger when the defendant's sawed-off shotgun was left in his and his wife's apartment after he was arrested. *See id.* at 885. This was because the shotgun posed a danger to the defendant's wife and child in the event the defendant was released and returned before a search warrant for the gun could be acquired. *Id.* at 886. The Court of Appeals considered factors such as that the defendant's wife was hysteric and worried about her husband's future actions, that the defendant already fired a weapon that night, that police were told of the nature of the firearm and that it was a contraband firearm under federal law, and that the responding officers knew of the defendant's past criminal conduct with firearms. *Id.*

The current case differs in some respects from *Hendrix*. But like *Hendrix*, Bettelyoun expressed her fear of Boyd and that he had abused and assaulted

her previously. Also, the officers possessed firsthand knowledge of the firearm's discharge that night in that area by Boyd and had information matching Boyd's clothing to that of the suspect. Thus, the officers had reason to suspect Boyd prior to Lt. Crow making contact with Boyd himself.

     Then, while waiting for Officer Montgomery to arrive, Lt. Crow witnessed a juvenile wave to him out of a window in a fashion he understood to request the officers enter the house. Officer Terkildsen also heard a loud argument coming from within a bedroom of the house, specifically a man yelling. This evidence suggests the situation became a domestic disturbance once Boyd ran into the house. Further, Lt. Crow learned that Boyd had threatened Bettelyoun's wellbeing in the past. This conduct certainly informed the officers that Boyd had fired a weapon earlier that evening and that Boyd was involved in domestic violence issues with Bettelyoun.

     Further, the officers responded to reports of gunshots. They found a suspect that matched the name dispatch supplied and wearing the clothes a witness described. They overhead an argument in the room where Boyd and Bettelyoun were located that was reasonably indicative of a domestic disturbance given the situation, and they witnessed a child motioning for them to enter the house. Finally, Bettelyoun informed them that Boyd may have had a weapon and that he abused her in the past, and at least Lt. Crow observed the children upset by this incident. Under these circumstances, it was reasonable for the officers to search for a weapon after the suspect was removed from the scene because it was reasonable for them to believe that the

17

unlocated firearm posed a serious danger to those still in the house—especially to the juveniles. The evidence supports a warrantless entry into the house based on exigent circumstances, but also the search for the firearm in the bedroom due to the situation's volatility. *See United States v. Henderson*, 553 F.3d 1163, 1165 (8th Cir. 2009). In arriving at this conclusion, the subjective, personal reasons the officers had for searching for the weapon are not dispositive since exigent circumstances are determined based on objective reasonability.

The magistrate judge's analysis of these circumstances accurately applies Eighth Circuit precedent on this point, including *Henderson*, 553 F.3d. Docket 39 at 24–26, 31. The officers here had good reason to secure the firearm in question, as did the officers in *Henderson* due to the domestic dispute. *Henderson*, 553 F.3d at 1164–65. While both the *Henderson* defendant and Boyd were secured when the search occurred, the dangers that made the circumstances exigent were still present at the time of the respective searches, namely: a legitimate concern of safety for the officers themselves and others with an unsecured firearm in the immediate vicinity.

As in *Henderson*, the officers here had strong reason to believe a firearm was in the bedroom and received information from Bettelyoun and her eleven-year-old daughter that Boyd acted in an intimidating manner, had a gun, and swung a samurai sword around. The magistrate judge is correct that exigent circumstances warranted securing the firearm in Boyd's case. Defeating Boyd's argument, the officers acted to secure the weapon which could inflict imminent

injury upon an occupant. *See Brigham City, Utah v. Stuart,* 547 U.S. 398, 403 (2006) ("One exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury. The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." (citation modified)).

Exigent circumstances existed that do not invalidate the officers' warrantless search of the bedroom. These circumstances consisted of officer safety as well as the safety of the community, specifically Bettelyoun and her young children. This objection is overruled.

Accordingly, it is hereby

ORDERED that Boyd's objections to the Report and Recommendation, Docket 41, are overruled. It is further

ORDERED that the Report and Recommendation, Docket 39, is adopted in full. It is further

ORDERED that Boyd's motion to suppress, Docket 21, is denied.

DATED February 23, 2026.

BY THE COURT:

*/s/ Camela C. Theeler*
CAMELA C. THEELER
UNITED STATES DISTRICT JUDGE